AO 91 (Rev. 11/11)   Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Middle District of Florida

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| | ) | Case No. |
| | ) | 3:16-mj- 1297-JBT |
| | ) | |
| WILFRIDO C. BALDERA | ) | |
| | ) | |
| _____ | | |
| *Defendant(s)* | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___July 6, 2016 & Nov. 2, 2016,___ in the county of _____Duval_____ in the

___Middle___ District of _____Florida_____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2252(a)(2) | Receipt of a visual depiction the production of which involved the use of a minor engaging in sexually explicit conduct |
| 18 U.S.C. § 2252(a)(4) | Possession of a visual depiction the production of which involved the use of a minor engaging in sexually explicit conduct |

This criminal complaint is based on these facts:

See attached affidavit.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Louis C. Hollis, Jr., HSI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: ___11/2/16___

_____
*Judge's signature*

City and state: _____Jacksonville, Florida_____

Joel B. Toomey, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF COMPLAINT

I, Louis C. Hollis Jr., being duly sworn, state as follows:

## INTRODUCTION

1.     I am a Special Agent (SA) with Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI), and have been so employed since March 2008. I am currently assigned to the Office of the Assistant Special Agent in Charge, Jacksonville, Florida, where I conduct a variety of investigations in the area of Cyber Crimes. I have a Bachelor's degree in Criminal Justice. I have received law enforcement training from the Federal Law Enforcement Training Center in Brunswick, Georgia. A portion of my duties are dedicated to investigating cases where computers and the internet are used in the sexual exploitation of children. Since becoming a Special Agent, I have worked with experienced Special Agents who also investigate Child Exploitation offenses. In the performance of my duties, I have investigated and assisted in the investigation of matters involving the possession, collection, production, advertisement, receipt, and/or transportation of images of child pornography. I have been involved in searches pertaining to the possession, collection, production, and/or transportation of child pornography through either the execution of search warrants or through the subject providing written consent to permit a search. I have investigated and assisted in the investigation of criminal matters involving the sexual exploitation of children that

1

constituted violations of Title 18, United States Code, Sections 2251, 2252 and 2252A, as well as Florida state statutes which criminalize the production, possession, receipt and transmission of child pornography, that is, visual images depicting minors engaged in sexually explicit conduct.

2.     As a federal agent, I am authorized to investigate violations of United States laws and to execute warrants issued under the authority of the United States. I have investigated and assisted in the investigation of criminal matters involving the sexual exploitation of children that constituted violations of Title 18, United States Code, Sections 2252 and 2252A, as well as Florida state statutes that criminalize the possession, receipt and transmission of child pornography, that is, visual images depicting minors engaged in sexually explicit conduct.

3.     The statements contained in this affidavit are based on my personal knowledge as well as on information provided to me by other law enforcement officers. This affidavit is being submitted for the limited purpose of establishing probable cause for the filing of a criminal complaint, and I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause that WILFRIDO C. BALDERA has committed violations of Title 18, United States Code, Sections 2252(a)(2) (Receipt of a visual depiction the production of which involved the use of a minor engaging in sexually explicit conduct); and 2252(a)(4) (Possession of a visual

depiction the production of which involved the use of a minor engaging in sexually explicit conduct).

4.    This affidavit is made in support of a complaint against WILFRIDO C. BALDERA, that is, on or about July 6, 2016, in Duval County, in the Middle District of Florida, WILFRIDO C. BALDERA did receive a visual depiction, the production of which involved the use of a minor engaging in sexually explicit conduct and which depiction was of such conduct and, on or about November 2, 2016, did possess depictions involving the use of a minor engaging in sexually explicit conduct, which visual depictions have actually been transported and transmitted using a means and facility of interstate commerce, that is, via the Internet, in violation of Title 18, United States Code, Section 2252(a)(4).

5.    On October 31, 2016, I applied for and obtained a federal search warrant for the premises located at 2268 Mayport Road, Lot 128, Atlantic Beach, Florida, 32233, which I believed to be occupied by WILFRIDO C. BALDERA, a copy of which is attached hereto as Exhibit A, and the facts and information contained therein are hereby incorporated by reference.

6.    On November 2, 2016, HSI – Jacksonville special agents, along with Jacksonville Sheriff's Office officers, executed the aforementioned search warrant at approximately 7:00 a.m. I encountered WILFRIDO C. BALDERA at the residence, along with his wife and minor son. Upon search of the residence, HSI agents

3

recovered multiple electronic devices, to include a Dell Inspiron N5040 laptop, with serial number DFX2DR1, bearing a stamp marked "Made in China." After being advised of and waiving his *Miranda* rights, BALDERA acknowledged that the Dell Inspiron laptop belonged to him, and that he used it to search for, receive and view child pornography.

7.     HSI Computer Forensics Agent James Greenmun conducted an initial and preliminary on-scene review of content on the Dell Inspiron laptop during the execution of the search warrant and discovered at least seven videos depicting minors engaging in sexually explicit conduct. I reviewed approximately five of the videos and, based on my training and experience, I believe the files depict at least one minor engaged in sexually explicit conduct, and therefore constitute child pornography pursuant to Title 18, United States Code, Section 2256. One of the videos I viewed that was found on the Dell Inspiron laptop during the preliminary examination during the execution of the search warrant is described below:

TITLE:      !!!NEW!!! 2010 K▇ 5YO fuck2(5yo ADLF sugargirl(1)

RECEIVED: On or about October 4, 2016

---

[1] I have redacted the portion of the file title that identifies a name that could be the true name of a minor victim.

4

DESCRIPTION: This file is a 1 minute .wmv-file video depicting a nude pre-pubescent female lying on a bed and a nude adult male penetrating the child's vagina with his penis.

8.     BALDERA also acknowledged that he had a desktop computer he used to view child pornography, which was also seized by HSI agents. During the interview, BALDERA stated that he occasionally masturbated to child pornography he downloaded via the Internet and described a sexual attraction to young pre-teen girls. BALDERA stated that he believes the age of consent should be 12 years old.

9.     During the interview, I showed him clips of video files obtained during the investigation from the Comcast Communications account number in his wife's name, from which law enforcement downloaded child pornography. One of the video files was:

TITLE:      pthc 9yo

RECEIVED: On or about July 6, 2016

DESCRIPTION: This file is a 2 minute and 1 second video file depicting a nude pre-pubescent female from the torso down with her ankles tied such that her legs are spread apart and elevated. An adult male is seen repeatedly penetrating the child's vagina. At the end of the video, the adult male ejaculates on the child's torso. Based on my training and experience, I believe the files depict at least one minor engaged in sexually explicit conduct, and

therefore constitute child pornography pursuant to Title 18, United States Code, Section 2256.

BALDERA admitted that he recognized the video and had viewed the file before.

## CONCLUSION

10.     Based upon the foregoing facts, and including those facts set forth in Exhibit A, I have probable cause to believe that on or about July 6, 2016, WILFRIDO C. BALDERA did receive a visual depiction, the production of which involved the use of a minor engaging in sexually explicit conduct and which depiction was of such conduct and, on or about November 2, 2016, did possess depictions involving the use of a minor engaging in sexually explicit conduct, which visual depictions have actually been transported and transmitted using a means and facility of interstate commerce, that is, via the Internet, in violation of Title 18, United States Code, Section 2252(a)(4).

Louis C. Hollis, Special Agent
Homeland Security Investigations

Sworn to before me this
this  2   day of November, 2016

JOEL B. TOOMEY
United States Magistrate Judge

6

# EXHIBIT A

AO 93  (Rev. 12/09) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT
### for the
Middle District of Florida

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br><br>premises located at 2268 Mayport Road, Lot 128,<br>Atlantic Beach, FL 32233,<br>described further in Attachment A | )<br>)<br>)  Case No.   3:16-mj-1293-MCR<br>)<br>)<br>) |

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____Middle_____ District of _____Florida_____
*(identify the person or describe the property to be searched and give its location)*:

premises located at 2268 Mayport Road, Lot 128, Atlantic Beach, FL 32233, described further in Attachment A.

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:

See Attachment B.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.

**YOU ARE COMMANDED** to execute this warrant on or before    *Nov. 10, 2016*
                                                               *(not to exceed 14 days)*

☑ in the daytime 6:00 a.m. to 10 p.m.     ☐ at any time in the day or night as I find reasonable cause has been
                                             established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge
_____Monte C. Richardson_____ .
                    *(name)*

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*   ☐ for _____ days *(not to exceed 30)*.
                                                               ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:    *10/31/16 @ 2:37 a.m.*            _____
                                                          *Judge's signature*

City and state:   Jacksonville, Florida                   MONTE C. RICHARDSON, U.S. Magistrate Judge
                                                          *Printed name and title*

CERTIFIED A TRUE COPY
SHERYL L LOESCH, CLERK
U.S. DISTRICT COURT
By: _____
Deputy Clerk

## ATTACHMENT A

## PREMISES TO BE SEARCHED

The premises to be searched is a residence located at 2268 Mayport Road, Lot 128, Atlantic Beach, FL 32233, that is a gray colored, double wide manufactured mobile home located in a mobile home community named "Admiral's Walk" which is located on the west side of Mayport Road. The exterior of the residence has gray colored siding with white skirting on the bottom. There is a covered driveway on the side of the residence that is supported by two posts. The back entrance is on the opposite side of the residence and has three wooden steps with a single handrail leading up to it. There is a concrete water fountain on the side of the house facing the road. The numerals "128" are located above and to the right of the covered driveway.

ATTACHMENT B

LIST OF ITEMS TO BE SEIZED AND SEARCHED

1.    Any and all computer(s), computer hardware, computer software, electronic storage media (including any and all disk drives, compact disks, flash drives, cellular telephones, personal digital assistants (PDA), digital cameras and/or memory cards, or any other device capable of electronic storage of data and/or images), computer-related documentation, computer passwords and data-security devices, videotapes, video recording devices, video recording players, and video display monitors that are or may be used to:  visually depict child pornography or child erotica; display or access information pertaining to a sexual interest in child pornography; display or access information pertaining to sexual activity with children; or distribute, possess, or receive child pornography or child erotica.

2.    Any and all computer software, including programs to run operating systems, applications, such as word processing, graphics, and communications programs peer to peer software, that may be or are used to: visually depict child pornography or child erotica, display or access information pertaining to a sexual interest in child pornography; display or access information pertaining to sexual activity with children; or distribute, possess or receive child pornography or child erotica.

3.    Any and all notes, documents, records, or correspondence, in any format and medium (including envelopes, letters, papers, email messages, chat logs

1

and electronic messages, and handwritten notes) pertaining to the possession, receipt, or distribution of child pornography as defined in 18 U.S.C. § 2256(8) or to the possession, receipt, or distribution of visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

4.    In any format and medium, all originals, computer files, copies, and negatives of child pornography as defined in 18 U.S.C. § 2256(8), visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2), or child erotica.

5.    Any and all diaries or address books containing names or lists of names and addresses of individuals who have been contacted by use of the computer(s) or by other means for the purpose of distributing or receiving child pornography as defined in 18 U.S.C. § 2256(8) or visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

6.    Any and all notes, documents, records, or correspondence, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and handwritten notes), identifying persons transmitting, through interstate or foreign commerce by any means (including the United States Mail or computer) any child pornography as defined in 18 U.S.C. § 2256(8) or any visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

7.    Any and all notes, documents, records, or correspondence, in any format or medium (including envelopes, letters, papers, email messages, chat logs and

2

electronic messages, other digital data files and web cache information) concerning the receipt, transmission, or possession of child pornography as defined in 18 U.S.C. § 2256(8) or visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

8.    Any and all notes, documents, records, or correspondence, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files) concerning communications between individuals about child pornography or the existence of sites on the Internet that contain child pornography or that cater to those with an interest in child pornography.

9.    Any and all notes, documents, records, or correspondence, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files) concerning membership in online groups, clubs, or services that provide or make accessible child pornography to members.

10.    Any and all records, documents, invoices and materials, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files) that concern any accounts with an internet service provider that may be or is used to: visually depict child pornography or child erotica, display or access information pertaining to a sexual interest in child pornography; display or access information pertaining to sexual activity with children; or distribute, possess or receive child pornography or child erotica.

3

11.    Any and all records, documents, invoices and materials, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files) that concern online storage or other remote computer storage, including software used to access such online storage or remote computer storage, user logs or archived data that show connection to such online storage or remote computer storage, and user logins and passwords for such online storage or remote computer storage that may be or are used to: visually depict child pornography or child erotica, display or access information pertaining to a sexual interest in child pornography; display or access information pertaining to sexual activity with children; or distribute, possess or receive child pornography or child erotica.

12.    Any and all cameras, film, videotapes or other photographic equipment that may be or are used to: visually depict child pornography or child erotica, display or access information pertaining to a sexual interest in child pornography; display or access information pertaining to sexual activity with children; or distribute, possess or receive child pornography or child erotica.

13.    Any and all address books, mailing lists, supplier lists, mailing address labels, and any and all documents and records, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files), pertaining to the preparation, purchase, and acquisition of names or lists of names to be used in connection with the purchase, sale, trade, or transmission, through interstate or foreign commerce by any means (including the

United States Mail or computer) any child pornography as defined in 18 U.S.C. § 2256(8) or any visual depiction of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

14.    Any and all documents, records, or correspondence, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files), pertaining to occupancy or ownership of the premises described above, including rental or lease agreements, mortgage documents, rental or lease payments, utility and telephone bills, mail envelopes, or addressed correspondence.

15.    Any and all diaries, notebooks, notes, and any other records reflecting personal contact and any other activities with minors visually depicted while engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT

### for the

### Middle District of Florida

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No. 3:16-mj- *1293-MCr* |
| premises located at 2268 Mayport Road, Lot 128, Atlantic Beach, FL 32233, described further in Attachment A | ) ) ) | |

### APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

premises located at 2268 Mayport Road, Lot 128, Atlantic Beach, FL 32233, described further in Attachment A,

located in the _____Middle_____ District of _____Florida_____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2252 | Receipt, distribution and possession of material involving the sexual exploitation of a minor |
| 18 U.S.C. § 2252A | Receipt, distribution and possession of material containing child pornography |

The application is based on these facts:

See Attached Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

CERTIFIED A TRUE COPY
SHERYL L LOESCH, CLERK
U.S. DISTRICT COURT
By: _____
    Deputy Clerk

Sworn to before me and signed in my presence.

_____
*Applicant's signature*

Louis C. Hollis, Special Agent, HSI
*Printed name and title*

Date: __10/31/16__

_____
*Judge's signature*

City and state:  Jacksonville, Florida

MONTE C. RICHARDSON, U.S. Magistrate Judge
*Printed name and title*

## ATTACHMENT A

## PREMISES TO BE SEARCHED

The premises to be searched is a residence located at 2268 Mayport Road, Lot 128, Atlantic Beach, FL 32233, that is a gray colored, double wide manufactured mobile home located in a mobile home community named "Admiral's Walk" which is located on the west side of Mayport Road. The exterior of the residence has gray colored siding with white skirting on the bottom. There is a covered driveway on the side of the residence that is supported by two posts. The back entrance is on the opposite side of the residence and has three wooden steps with a single handrail leading up to it. There is a concrete water fountain on the side of the house facing the road. The numerals "128" are located above and to the right of the covered driveway.

## ATTACHMENT B
## LIST OF ITEMS TO BE SEIZED AND SEARCHED

1.     Any and all computer(s), computer hardware, computer software, electronic storage media (including any and all disk drives, compact disks, flash drives, cellular telephones, personal digital assistants (PDA), digital cameras and/or memory cards, or any other device capable of electronic storage of data and/or images), computer-related documentation, computer passwords and data-security devices, videotapes, video recording devices, video recording players, and video display monitors that are or may be used to: visually depict child pornography or child erotica; display or access information pertaining to a sexual interest in child pornography; display or access information pertaining to sexual activity with children; or distribute, possess, or receive child pornography or child erotica.

2.     Any and all computer software, including programs to run operating systems, applications, such as word processing, graphics, and communications programs peer to peer software, that may be or are used to: visually depict child pornography or child erotica, display or access information pertaining to a sexual interest in child pornography; display or access information pertaining to sexual activity with children; or distribute, possess or receive child pornography or child erotica.

3.     Any and all notes, documents, records, or correspondence, in any format and medium (including envelopes, letters, papers, email messages, chat logs

and electronic messages, and handwritten notes) pertaining to the possession, receipt, or distribution of child pornography as defined in 18 U.S.C. § 2256(8) or to the possession, receipt, or distribution of visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

4.     In any format and medium, all originals, computer files, copies, and negatives of child pornography as defined in 18 U.S.C. § 2256(8), visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2), or child erotica.

5.     Any and all diaries or address books containing names or lists of names and addresses of individuals who have been contacted by use of the computer(s) or by other means for the purpose of distributing or receiving child pornography as defined in 18 U.S.C. § 2256(8) or visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

6.     Any and all notes, documents, records, or correspondence, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and handwritten notes), identifying persons transmitting, through interstate or foreign commerce by any means (including the United States Mail or computer) any child pornography as defined in 18 U.S.C. § 2256(8) or any visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

7.     Any and all notes, documents, records, or correspondence, in any format or medium (including envelopes, letters, papers, email messages, chat logs and

2

electronic messages, other digital data files and web cache information) concerning

the receipt, transmission, or possession of child pornography as defined in

18 U.S.C. § 2256(8) or visual depictions of minors engaged in sexually explicit

conduct, as defined in 18 U.S.C. § 2256(2).

8.     Any and all notes, documents, records, or correspondence, in any

format or medium (including envelopes, letters, papers, email messages, chat logs and

electronic messages, and other digital data files) concerning communications

between individuals about child pornography or the existence of sites on the Internet

that contain child pornography or that cater to those with an interest in child

pornography.

9.     Any and all notes, documents, records, or correspondence, in any

format or medium (including envelopes, letters, papers, email messages, chat logs and

electronic messages, and other digital data files) concerning membership in online

groups, clubs, or services that provide or make accessible child pornography to

members.

10.    Any and all records, documents, invoices and materials, in any format

or medium (including envelopes, letters, papers, email messages, chat logs and

electronic messages, and other digital data files) that concern any accounts with an

internet service provider that may be or is used to: visually depict child pornography

or child erotica, display or access information pertaining to a sexual interest in child

pornography; display or access information pertaining to sexual activity with

children; or distribute, possess or receive child pornography or child erotica.

11.     Any and all records, documents, invoices and materials, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files) that concern online storage or other remote computer storage, including software used to access such online storage or remote computer storage, user logs or archived data that show connection to such online storage or remote computer storage, and user logins and passwords for such online storage or remote computer storage that may be or are used to: visually depict child pornography or child erotica, display or access information pertaining to a sexual interest in child pornography; display or access information pertaining to sexual activity with children; or distribute, possess or receive child pornography or child erotica.

12.     Any and all cameras, film, videotapes or other photographic equipment that may be or are used to: visually depict child pornography or child erotica, display or access information pertaining to a sexual interest in child pornography; display or access information pertaining to sexual activity with children; or distribute, possess or receive child pornography or child erotica.

13.     Any and all address books, mailing lists, supplier lists, mailing address labels, and any and all documents and records, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files), pertaining to the preparation, purchase, and acquisition of names or lists of names to be used in connection with the purchase, sale, trade, or transmission, through interstate or foreign commerce by any means (including the

United States Mail or computer) any child pornography as defined in 18 U.S.C. § 2256(8) or any visual depiction of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

14.     Any and all documents, records, or correspondence, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files), pertaining to occupancy or ownership of the premises described above, including rental or lease agreements, mortgage documents, rental or lease payments, utility and telephone bills, mail envelopes, or addressed correspondence.

15.     Any and all diaries, notebooks, notes, and any other records reflecting personal contact and any other activities with minors visually depicted while engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

5

## AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

I, Louis C. Hollis Jr., being duly sworn, state as follows:

## INTRODUCTION

1.    I am a Special Agent (SA) with Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI), and have been so employed since March 2008. I am currently assigned to the Office of the Assistant Special Agent in Charge, Jacksonville, Florida, where I conduct a variety of investigations in the area of Cyber Crimes.  I have a Bachelor's degree in Criminal Justice.  I have received law enforcement training from the Federal Law Enforcement Training Center in Brunswick, Georgia.  A portion of my duties are dedicated to investigating cases where computers and the internet are used in the sexual exploitation of children. Since becoming a Special Agent, I have worked with experienced Special Agents who also investigate Child Exploitation offenses.  In the performance of my duties, I have investigated and assisted in the investigation of matters involving the possession, collection, production, advertisement, receipt, and/or transportation of images of child pornography.  I have been involved in searches pertaining to the possession, collection, production, and/or transportation of child pornography through either the execution of search warrants or through the subject providing written consent to permit a search.  I have investigated and assisted in the investigation of criminal matters involving the sexual exploitation of children that constituted violations of Title 18, United States Code, Sections 2251, 2252 and 2252A, as well as Florida state statutes which criminalize the production, possession,

1

receipt and transmission of child pornography, that is, visual images depicting minors engaged in sexually explicit conduct.

2.     As a federal agent, I am authorized to investigate violations of United States laws and to execute warrants issued under the authority of the United States. I have investigated and assisted in the investigation of criminal matters involving the sexual exploitation of children that constituted violations of Title 18, United States Code, Sections 2252 and 2252A, as well as Florida state statutes that criminalize the possession, receipt and transmission of child pornography, that is, visual images depicting minors engaged in sexually explicit conduct.

3.     The statements contained in this affidavit are based on my personal knowledge as well as on information provided to me by other law enforcement officers. This affidavit is being submitted for the limited purpose of securing a search warrant, and I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe evidence of violations of Title 18, United States Code, Sections 2252 and 2252A, is present in the premises and items to be searched.

## STATUTORY AUTHORITY

4.     This investigation concerns alleged violations of Title 18, United States Code, Sections 2252 and 2252A, relating to material involving the sexual exploitation of minors. Based upon my training and experience, as well as conversations with other experienced law enforcement officers and computer forensic examiners, I know the following:

2

a.     18 U.S.C. § 2252(a) in pertinent part prohibits a person from knowingly transporting, shipping, receiving, distributing, reproducing for distribution, possessing or accessing with intent to view any visual depiction of minors engaging in sexually explicit conduct using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce, including by computer or mail.

b.     18 U.S.C. § 2252A(a) in pertinent part prohibits a person from knowingly transporting, shipping, receiving, distributing, reproducing for distribution, possessing, or accessing with intent to view any child pornography, as defined in 18 U.S.C. § 2256(8), using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce, including by computer.

c.     18 U.S.C. § 2252(a)(1) prohibits a person from knowingly transporting or shipping using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce, including by computer or mails, any visual depiction of minors engaging in sexually explicit conduct. Under 18 U.S.C. § 2252(a)(2), it is a federal crime for any person to knowingly receive or distribute, by any means including by computer, any visual depiction of minors engaging in sexually explicit conduct using any means or facility of interstate or foreign commerce or that has been mailed or shipped or transported in or affecting interstate or foreign commerce. That section also makes it a federal crime for any person to knowingly reproduce any visual depiction of minors engaging in sexually explicit conduct for distribution using any means or facility of interstate or foreign

3

commerce or in or affecting interstate or foreign commerce or through the mails. Under 18 U.S.C. § 2252(a)(4), it is also a crime for a person to knowingly possess or knowingly access with intent to view, one or more books, magazines, periodicals, films, or other materials that contain visual depictions of minors engaged in sexually explicit conduct that has been mailed, or has been shipped or transported using any means or facility of interstate or foreign commerce or in and affecting interstate or foreign commerce, or which was produced using materials which have been mailed or so shipped or transported, by any means including by computer.

   d.   18 U.S.C. § 2252A(a)(1) prohibits a person from knowingly mailing, transporting, or shipping using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means, including by computer, any child pornography. 18 U.S.C. § 2252A(a)(2) prohibits a person from knowingly receiving or distributing any child pornography that has been mailed or shipped or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means, including by computer. 18 U.S.C. § 2252A(a)(3) prohibits a person from knowingly reproducing child pornography for distribution through the mails or in or affecting interstate or foreign commerce by any means, including by computer. 18 U.S.C. § 2252A(a)(5)(B) prohibits a person from knowingly possessing or knowingly accessing with intent to view any book, magazine, periodical, film, videotape, computer disk, or other material that contains an image of child pornography that has been mailed, or shipped or transported using any means or facility of interstate or foreign

4

commerce or in or affecting interstate or foreign commerce by any means, including by computer, or that was produced using materials that have been mailed, or shipped or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means, including by computer.

## DEFINITIONS

5.      The following definitions apply to this Affidavit:

a.      "Child erotica," as used herein, means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not, in and of themselves, obscene or that do not necessarily depict minors in sexually explicit poses or positions.

b.      "Child pornography," as used herein, includes the definition in 18 U.S.C. § 2256(8) (any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involves the use of a minor engaging in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaging in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaging in sexually explicit conduct).

c.      "Visual depictions" include undeveloped film and videotape, data stored on computer disk or by electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has

5

been transmitted by any means, whether or not stored in permanent format. *See* 18 U.S.C. § 2256(5).

      d.    "Sexually explicit conduct" means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic area of any persons. *See* 18 U.S.C. § 2256(2).

      e.    "Computer," as used herein, is defined pursuant to 18 U.S.C. § 1030(e)(1), as "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device."

      f.    "Computer hardware," as used herein, consists of all equipment which can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

g.     "Computer software," as used herein, is digital information which can be interpreted by a computer and any of its related components to direct the way they work.   Computer software is stored in electronic, magnetic, or other digital form.   It commonly includes programs to run operating systems, applications, and utilities.

h.     The terms "records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade form (including, but not limited to, writings, drawings, paintings), photographic form (including, but not limited to, microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies), mechanical form (including, but not limited to, phonograph records, printing, typing) or electrical, electronic or magnetic form (including, but not limited to, tape recordings, cassettes, compact discs, electronic or magnetic storage devices such as floppy diskettes, hard disks, CD-ROMs, digital video disks (DVDs), personal digital assistants (PDAs), multimedia cards (MMCs), memory sticks, optical disks, printer buffers, smart cards, memory calculators, electronic dialers, or electronic notebooks, as well as digital data files and printouts or readouts from any magnetic, electrical or electronic storage device).

i.     "Computer passwords and data security devices," as used herein, consist of information or items designed to restrict access to or hide computer software, documentation, or data.   Data security devices may consist of hardware, software, or other programming code.   A password (a string of alpha numeric

7

characters) usually operates a sort of digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Digitally coded data security software may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "boobytrap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

j.    "Internet Protocol address" or "IP address" refers to a unique number used by a computer to access the Internet and is associated with a physical address. IP addresses can be dynamic, meaning that the Internet Service Provider (ISP) assigns a unique and different number to a computer every time it accesses the Internet. IP addresses might also be static if, for example, an ISP assigns a user's computer a particular IP address which is used each time the computer accesses the Internet.

k.    "Wireless telephone" (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in

8

electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device. Many wireless telephones are minicomputers or "smart phones" with immense storage capacity.

l.    A "digital camera" is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

m.    A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of

9

electronic data and may offer additional features such as a calendar, contact list, clock, or games.

n.     A personal digital assistant, or "PDA," is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

o.     A "tablet" is a mobile computer, typically larger than a phone yet smaller than a notebook that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

10

## COMPUTERS AND CHILD PORNOGRAPHY

6.     Based upon my training and experience, as well as conversations with other experienced law enforcement officers and computer forensic examiners, I know that computers and computer technology have revolutionized the way in which individuals interested in child pornography interact with each other.   In the past, child pornography was produced using cameras and film (either still photography or movies).   The photographs required darkroom facilities and a significant amount of skill in order to develop and reproduce the images. There were definable costs involved with the production of pornographic images, and to distribute these images on any scale required significant resources and significant risks. The photographs themselves were somewhat bulky and required secure storage to prevent their exposure to the public and/or law enforcement. The distribution of these wares was accomplished through a combination of personal contacts, mailings and telephone calls.

7.     The development of computers has radically changed the way that child pornographers obtain, distribute and store their contraband. Computers basically serve five functions in connection with child pornography: access, production, communication, distribution, and storage.

8.     Child pornographers can now convert paper photographs taken with a traditional camera (using ordinary film) into a computer readable format with a device known as a scanner.   Moreover, with the advent, proliferation and widespread use of digital cameras, the images can now be transferred directly from a digital

11

camera onto a computer using a connection known as a USB cable or other device. Digital cameras have the capacity to store images and videos indefinitely, and memory storage cards used in these cameras are capable of holding hundreds of images and videos. A device known as a modem allows any computer to connect to another computer through the use of telephone, cable, or wireless connection. Electronic contact can be made to millions of computers around the world.

9.     The computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography. The size of the electronic storage media, that is, the hard disk drive used in home computers has grown tremendously within the last several years. These hard disk drives can store hundreds of thousands of images at very high resolution.

10.     The World Wide Web of the Internet affords collectors of child pornography several different venues for obtaining, viewing and trading child pornography in a relatively secure and anonymous fashion.

11.     Collectors and distributors of child pornography frequently use online resources to retrieve and store child pornography, including services offered by Internet Portals such as Yahoo!, Hotmail, and Google, among others. The online services allow a user to set up an account with a remote computing service that provides email services as well as electronic storage of computer files in any variety of formats. A user can set up an online storage account from any computer with access to the Internet. Evidence of such online storage of child pornography is often

found on the user's computer. Even in cases where online storage is used, however, evidence of child pornography can be found on the user's computer in most cases.

12.    As is the case with most digital technology, communication by way of computer can be saved or stored on the computer used for these purposes. Storing this information can be intentional, *i.e.*, by saving an email as a file on the computer or saving particular website locations in, for example, "bookmarked" files. Digital information, images and videos can also be retained unintentionally, *e.g.*, traces of the path of an electronic communication may be automatically stored in many places (*e.g.*, temporary files or ISP client software, among others). Often, a computer will automatically save transcripts or logs of electronic communications between its user and other users that have occurred over the Internet. These logs are commonly referred to as "chat logs." Some programs allow computer users to trade images while simultaneously engaging in electronic communications with each other. This is often referred to as "chatting," or "instant messaging." Based upon my training and experience, as well as conversations with other law enforcement officers and computer forensic examiners, I know that these electronic "chat logs" often have great evidentiary value in child pornography investigations, as they record communication in transcript form, show the date and time of such communication, and also may show the dates and times when images of child pornography were traded over the Internet. In addition to electronic communication, a computer user's internet activities generally leave traces or "footprints" in the web cache and history files of the browser used. A forensic examiner often can recover evidence suggesting

whether a computer contains peer-to-peer software, when the computer was sharing files, and some of the files which were uploaded or downloaded. Such information is often maintained on a computer for long periods of time until overwritten by other data.

## SEARCH AND SEIZURE OF COMPUTER SYSTEMS

13. Based upon my training and experience, as well as conversations with other experienced law enforcement officers, I know that searches and seizures of evidence from computers commonly require agents to download or copy information from the computers and their components, or seize most or all computer items (computer hardware, computer software, and computer related documentation) to be processed later by a qualified computer expert in a laboratory or other controlled environment. This is almost always true because of the following:

a.     Computer storage devices (*e.g.*, hard drives, compact discs ("CDs"), diskettes, tapes, and others) can store the equivalent of thousands of pages of information. Especially when the user wants to conceal criminal evidence, he or she often stores it in random order with deceptive file names. This requires searching authorities to examine all the stored data to determine whether it is included in the warrant. This sorting process can take days or weeks, depending on the volume of data stored, and it would be generally impossible to accomplish this kind of data search on site; and

b.     Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The

vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert should analyze the system and its data. The search of a computer system, which includes the use of data search protocols, is an exacting scientific procedure which is designed to protect the integrity of the evidence and to recover hidden, erased, compressed, password protected, or encrypted files. Since computer evidence is extremely vulnerable to tampering or destruction (which may be caused by malicious code or normal activities of an operating system), the controlled environment of a laboratory is essential to its complete and accurate analysis.

## CHILD PORNOGRAPHY COLLECTOR CHARACTERISTICS

14. Based on my experience, training, and conversations with other experienced agents who investigate cases involving the sexual exploitation of children, I know that certain common characteristics are often present in individuals who collect child pornography. I have observed and/or learned about the reliability of these commonalities and conclusions involving individuals who collect, produce and trade images of child pornography. Based upon my training and experience, and conversations with other experienced agents in the area of investigating cases involving the sexual exploitation of children, I know that the following traits and characteristics are often present in individuals who collect child pornography:

a. Many individuals who traffic in and trade images of child pornography also collect child pornography. Many individuals who collect child

15

pornography have a sexual attraction to children. They receive sexual gratification and satisfaction from sexual fantasies fueled by sexually explicit depictions of children.

b.    Many individuals who collect child pornography collect sexually explicit materials, which may consist of photographs, magazines, motion pictures, video tapes, books, slides, computer graphics or digital or other images for their own sexual gratification. Many of these individuals also collect child erotica, which may consist of images or text that do not rise to the level of child pornography but which nonetheless fuel their deviant sexual fantasies involving children.

c.    Many individuals who collect child pornography often seek out like minded individuals, either in person or on the Internet, to share information and trade depictions of child pornography and child erotica as a means of gaining status, trust, acceptance, and support. This contact also helps these individuals to rationalize and validate their deviant sexual interest and associated behavior. The different Internet-based vehicles used by such individuals to communicate with each other include, but are not limited to, Peer-to-Peer (P2P) file-sharing programs, email, email groups, bulletin boards, Internet Relay Chat Rooms (IRC), newsgroups, instant messaging, and other similar vehicles.

d.    Many individuals who collect child pornography maintain books, magazines, newspapers and other writings (which may be written by the collector), in hard copy or digital medium, on the subject of sexual activities with children as a way of understanding their own feelings toward children, justifying those feelings

16

and finding comfort for their illicit behavior and desires. Such individuals often do not destroy these materials because of the psychological support that they provide.

e.     Many individuals who collect child pornography often collect, read, copy or maintain names, addresses (including email addresses), phone numbers, or lists of persons who have advertised or otherwise made known in publications and on the Internet that they have similar sexual interests. These contacts are maintained as a means of personal referral, exchange or commercial profit. These names may be maintained in the original medium from which they were derived, in telephone books or notebooks, on computer storage devices, or merely on scraps of paper.

f.     Many individuals who collect child pornography rarely, if ever, dispose of their sexually explicit materials and may go to great lengths to conceal and protect them from discovery, theft, or damage. These individuals view their sexually explicit materials as prized and valuable materials, even as commodities to be traded with other like-minded individuals over the Internet. As such, they tend to maintain or "hoard" their visual depictions of child pornography for long periods of time in the privacy and security of their homes or other secure locations. These individuals may protect their illicit materials by passwords, encryption, and other security measures; save it on movable media such as CDs, DVDs, flash memory, thumb drives, and removable hard drives, which can be very small in size, including as small as a postage stamp, and easily secreted; or send it to third-party image storage sites via the Internet. Based on my training and experience, as well as my conversations with

17

other experienced law enforcement officers, I know that individuals who possess, receive, and/or distribute child pornography by computer using the Internet often maintain and/or possess the items listed in Attachment B.

15.    As stated in substance above and based upon my training and experience, as well as my conversations with other experienced law enforcement officers, I know that individuals who collect and trade child pornography often do not willfully dispose of their child pornography collections, even after contact with law enforcement officials. For example, I assisted on an HSI investigation in 2016 in the Middle District of Florida in which the subject had his residence searched in July 2016 pursuant to a state search warrant and his wireless telephone and computer tablet seized by the Jacksonville Sheriff's Office. The search of these devices revealed the subject knowingly possessed several images of child pornography. The subject retained an attorney and both were made aware of the ongoing investigation into the subject's commission of child pornography offenses. Approximately two months later, the subject was arrested on federal child pornography charges. On the same day as the subject's arrest, HSI executed a federal search warrant and seized a wireless telephone owned and used by the subject after the execution of the state search warrant at his residence. Subsequent forensic examination of this wireless telephone revealed that the subject had received, possessed and viewed images of child pornography numerous times *after* the execution of the state search warrant and before his federal arrest.

18

## BITTORRENT PEER-TO-PEER FILE SHARING

16.     Based on my training and experience, I know the following regarding Peer-to-Peer (hereinafter referred to as "P2P") file-sharing networks, P2P client software programs, and the BitTorrent P2P file sharing network:

17.     A growing phenomenon on the Internet is P2P file sharing. P2P file sharing is a method of communication available to Internet users through the use of special software programs. P2P file-sharing programs allow groups of computers using the same file sharing network and protocols to transfer digital files from one computer system to another while connected to a network, usually on the Internet. There are multiple types of P2P file-sharing networks on the Internet. To connect to a particular P2P file-sharing network, a user first obtains a P2P client software program for a particular P2P file-sharing network, which can be downloaded from the Internet. A particular P2P file-sharing network may have many different P2P client software programs that allow access to that particular P2P file sharing network. Additionally, a particular P2P client software program may be able to access multiple P2P file-sharing networks. These P2P client software programs share common protocols for network access and file sharing. The user interface features, and configurations may vary between clients and versions of the same client.

18.     In general, P2P client software allows the user to set up file(s) on a computer to be shared on a P2P file-sharing network with other users running compatible P2P client software. A user can also obtain files by opening the P2P client software on the user's computer and conducting a search for files that are of

interest and currently being shared on a P2P file-sharing network.

19.    Some P2P file-sharing networks are designed to allow users to download files and frequently provide enhanced capabilities to reward the sharing of files by providing reduced wait periods, higher user ratings, or other benefits.   In some instances, users are not allowed to download files if they are not sharing files. Settings within these programs control sharing thresholds.

20.    Typically, during a default installation of a P2P client software program, settings are established which configure the host computer to share files. Depending upon the P2P client software used, a user may have the ability to reconfigure some of those settings during installation or after the installation has been completed.

21.    Typically, a setting establishes the location of one or more directories or folders whose contents (digital files) are made available for distribution to other P2P clients. In some clients, individual files can also be shared.

22.    Also, a setting controls whether or not files are made available for distribution to other P2P clients. Typically, a setting controls whether or not users will be able to share portions of a file while they are in the process of downloading the entire file. This feature increases the efficiency of the network by putting more copies of file segments on the network for distribution.

23.    Typically, files being shared by P2P clients are processed by the client software. As part of this processing, a hashed algorithm value is computed for each file and/or piece of a file being shared (dependent on the P2P file sharing network),

20

which uniquely identifies it on the network. A file (or piece of a file) processed by this hash algorithm operation results in the creation of an associated hash value often referred to as a digital signature. Some hash algorithms provide a certainty exceeding 99.99 percent that two or more files with the same hash value are identical copies of the same file regardless of their file names. By using a hash algorithm to uniquely identify files on a P2P network, it improves the network efficiency. Because of this, typically, users may receive a selected file from numerous sources by accepting segments of the same file from multiple clients and then reassembling the complete file on the local computer. This is referred to as multiple source downloads. The client program succeeds in reassembling the file from different sources only if all the segments came from exact copies of the same file. P2P file-sharing networks use hash values to ensure exact copies of the same file are used during this process.

24.    P2P file-sharing networks, including the BitTorrent network, are frequently used to trade digital files of child pornography. These files include both image and movie files.

25.    The BitTorrent network is a very popular and publically available P2P file-sharing network. Most computers that are part of this network are referred to as "peers." The terms "peers" and "clients" can be used interchangeably when referring to the BitTorrent network. A peer can simultaneously provide files to some peers while downloading files from other peers.

26.    The BitTorrent network can be accessed by computers running many different client programs, some of which include the BitTorrent client program,

uTorrent client program, and Vuze client program. These client programs are publically available and free P2P client software programs that can be downloaded from the Internet. There are also BitTorrent client programs that are not free. These BitTorrent client programs share common protocols for network access and file sharing. The user interface features and configuration may vary between clients and versions of the same client.

27.     During the installation of typical BitTorrent network client programs, various settings are established that configure the host computer to share files. Depending upon the BitTorrent client used, a user may have the ability to reconfigure some of those settings during installation or after the installation has been completed. Typically, a setting establishes the location of one or more directories or folders whose contents (files) are made available to other BitTorrent network users to download.

28.     In order to share a file or a set of files on the BitTorrent network, a "Torrent" file needs to be created by the user that initially wants to share the file or set of files. A "Torrent" is typically a small file that describes the file(s) that is(are) being shared, which may include information on how to locate the file(s) on the BitTorrent network. A typical BitTorrent client will have the ability to create a "Torrent" file. It is important to note that the "Torrent" file does not contain the actual file(s) being shared, but information about the file(s) described in the "Torrent," such as the name(s) of the file(s) being referenced in the "Torrent" and the

22

"info hash" of the "Torrent."   The "info hash" is a SHA-1[1] hash value of the set of data describing the file(s) referred to in the "Torrent," which includes the SHA-1 hash value of each file piece, the file size, and the file name(s). . The "info hash" of each "Torrent" uniquely identifies the "Torrent" file on the BitTorrent network. The "Torrent" file may also contain information on how to locate file(s) referenced in the "Torrent" by identifying "Trackers." "Trackers" are computers on the BitTorrent network that collate information about the peers/clients that have recently reported they are sharing the file(s) referred to in the "Torrent" file. A "Tracker" is only a pointer to peers/clients on the network who may be sharing part or all of the file(s) referred to in the "Torrent." It is important to note that the "Trackers" do not actually have the file(s) and are used to facilitate the finding of other peers/clients that have the entire file(s) or at least a portion of the file(s) available for sharing. It should also be noted that the use of "Tracker(s)" on the BitTorrent network are not always necessary to locate peers/clients that have file(s) being shared from a particular "Torrent" file.   There are many publically available servers on the Internet that provide BitTorrent tracker services.

---

[1]SHA-1, or Secure Hash Algorithm Version 1, is a file encryption method which may be used to produce a unique digital signature of a file.  Finding a file that produces the same SHA-1 value as a known file requires a search and comparison of $10^{48}$ ($2^{160}$) different files, which is computationally infeasible. The Secure Hash Algorithm (SHA) was developed by the National Institute of Standards and Technology (NIST), along with the National Security Agency (NSA), for use with the Digital Signature Standard (DSS) as specified within the Secure Hash Standard (SHS). The United States of America has adopted the SHA-1 hash algorithm described herein as a Federal Information Processing Standard.

29.     Once a torrent is created, in order to share the file(s) referenced in the "Torrent" file, a user typically makes the "Torrent" available to other users, such as via websites on the Internet.

30.     In order to locate "Torrent" files of interest, a typical user will use keyword searches within the BitTorrent network client itself or on websites hosting "Torrents." Once a "Torrent" file is located that meets the keyword search criteria, the user will download the "Torrent" file to their computer. Alternatively, a user can also search for and locate "magnet links," which is a link that enables the BitTorrent network client program itself to download the "Torrent" to the computer. In either case, a "Torrent" file is downloaded to the user's computer. The BitTorrent network client will then process that "Torrent" file in order to find "Trackers" or utilize other means that will help facilitate finding other peers/clients on the network that have all or part of the file(s) referenced in the "Torrent" file. It is again important to note that the actual file(s) referenced in the "Torrent" are actually obtained directly from other peers/clients on the BitTorrent network and not the "Trackers" themselves. Typically, the "Trackers" on the network return information about remote peers/clients that have recently reported they have the same file(s) available for sharing (based on SHA-1 "info hash" value comparison), or parts of the same file(s), referred to in the "Torrent," to include the remote peers/clients Internet Protocol (IP) addresses.[2]

---

[2]Computers on the Internet identify each other by an Internet Protocol or IP address. IP addresses can assist law enforcement in finding a particular computer on the

31.    For example, a person interested in obtaining child pornographic images on the BitTorrent network would open the BitTorrent client application on his/her computer and conduct a keyword search for files using a term such as "preteen sex." (It should be noted that I do not have knowledge that this situation occurred in this investigation.) The results of the torrent search are typically returned to the user's computer by displaying them on the torrent hosting website. The hosting website will typically display information about the torrent, which can include the name of the torrent file, the name of the file(s) referred to in the torrent file, the file(s) size, and the "info hash" SHA-1 value of the torrent file. The user then selects a torrent of interest to download to his or her computer. Typically, the BitTorrent client program will then process the torrent file. The user selects the file(s) he or she wants to download from the results displayed that were referred to in the torrent file. Utilizing trackers and other BitTorrent network protocols (such as Distributed Hash Tables, Peer Exchange, and Local Peer Discovery), peers/clients are located that have recently reported they have the file(s) or parts of the file(s) referred to in the torrent file available for sharing. The file(s) is then downloaded directly from the computer(s) sharing the file. Typically, once the BitTorrent network client has downloaded part of a file(s), it may immediately begin sharing the file with other users on the network. The BitTorrent network client program succeeds in reassembling the file(s) from different sources only if it receives "pieces" with the

Internet.  IP addresses can typically lead the law enforcement officer to a particular Internet service company and that company can typically identify the account and location that used the IP address to access the Internet.

exact SHA-1 piece hash described in the torrent file. During the download process, a typical BitTorrent client program displays the Internet Protocol address of the peers/clients that appear to be sharing part or all of the file(s) referred to in the torrent file or other methods utilized by the BitTorrent network protocols. The downloaded file is then stored in the area previously designated by the user and/or the client program. The downloaded file(s), including the torrent file, will remain until moved or deleted.

32.    Typically, as described above, one method for investigators to search the BitTorrent network for users possessing and/or disseminating child pornography files is to type in search terms, based on their training and experience, that would return a torrent filename indicative of child pornography. The investigator would then download the file(s) referred to within the torrent file and determine if the file(s) indeed contained child pornography. If so, the investigator can document the "info hash" SHA-1 hash value of this torrent file to be compared with future identical torrent files observed on the BitTorrent network. Although transparent to the typical user, when searches are conducted, additional results are received from the trackers on other peers who recently reported to the network as having that file(s) in whole or in part, which may include the IP addresses of those peers/clients. This information can be documented by investigators and compared to those "info hash" SHA-1 hash values the investigator has obtained in the past and believes to be child pornography. This allows for the detection and investigation of computers involved in possessing, receiving, and/or distributing files of previously identified child pornography.

Therefore, without even downloading the file, the investigator can compare the "info hash" SHA-1 hash value and determine with mathematical certainty that a file seen on the network is an identical copy of a child pornography file he or she has seen before.

33.     The returned list of IP addresses can include computers that are likely to be within the investigator's jurisdiction. The ability to identify the approximate location of these IP addresses is provided by IP geographic mapping services, which are publicly available and also used for marketing and fraud detection. At this point in the investigative process, an association between a known torrent file (based on the "info hash" SHA-1 hash value comparison) and a computer having a specific IP address (likely to be located within a specific region) can usually be established.

34.     Once a client user is identified as recently having a file believed to be child pornography, in whole or in part, the investigator can then query that client user directly to confirm that the client user has that file, in whole or in part, and/or download that file directly from the client user exclusively, otherwise known as a single-source download. Depending upon several factors, including configuration and available resources, it might not be possible to do either. The process of sharing files on the BitTorrent network involves peers allowing other peers to copy a file or portions of a file. This sharing process does not remove the file from the computer sharing the file. This process places a copy of the file on the computer that downloaded it.

27

35.     If an investigator either received an affirmative response from a remote peer that they possess a digital file or the investigator received a digital file, in whole or in part, that is believed to contain child pornography from a remote peer at a specific IP address, the investigator can conclude that a computer, likely to be in this jurisdiction, is running a BitTorrent network P2P client and is currently possessing, receiving, and/or distributing specific and known visual depictions of child pornography.

36.     Law enforcement has created BitTorrent network client programs that obtain information from "Trackers" about peers/clients recently reporting that they are involved in sharing digital files of known actual child pornography (based on the "info hash" SHA-1 hash value), which then allows the downloading of a file from a single IP address (as opposed to obtaining the file from multiple peers/clients on the network). This procedure allows for the detection and investigation of those computers involved in sharing digital files of known actual child pornography on the BitTorrent network.

37.     During the query and/or downloading process from a remote BitTorrent network client, certain information may be exchanged between the investigator's client and the remote client they are querying and/or from where they are downloading a file. This information can include (1) the remote client's IP address; (2) a confirmation from the remote client that they have pieces of the file(s) being requested, in whole or in part, and that the pieces of the file(s) are being reported as shared from the remote client program; and (3) the remote client program

28

and version. This information may remain on the remote client's computer system for long periods of time. The investigator has the ability to log this information. A search can later be conducted on a seized computer system(s) for this information, which may provide further evidence that the investigator's client communicated with the remote client.

38.   The investigation of peer-to-peer file sharing networks is a cooperative effort of law enforcement agencies around the country. Many of these agencies are associated with the Internet Crimes against Children Task Force Program. P2P investigative methodology has led to the issuance and execution of search warrants around the country resulting in the arrest and conviction of numerous offenders possessing and/or distributing child pornography.

39.   Computers throughout the world can download files from download candidates without regard to geographic location. I know that the files located on P2P download candidates are quickly available throughout the world due to the distributed sharing model of P2P networks.

40.   Based on my training and experience, as well as conversations with other experienced law enforcement officers, I know that cooperating police agencies pool their information to assist in identifying criminal conduct and to build probable cause to further criminal investigations. With this pooled information, law enforcement officers may obtain a better understanding of the global information available about a suspect that resides within their geographic area of jurisdiction. Given the global scope of the Internet, this information is valuable when trying to

29

establish the location of a suspect. Investigators from around the world gather and log information, which can be used by an investigator to establish probable cause for a specific investigation in his or her jurisdiction.

## BACKGROUND OF INVESTIGATION AND
## FACTS ESTABLISHING PROBABLE CAUSE

41.    I make this affidavit in support of a search warrant for the premises located at 2268 Mayport Road, Lot 128, Atlantic Beach, Florida (the "Subject Premises"), which I believe to be currently occupied by Wilfrido Baldera (date of birth ████, 1978), Cristobal Baldera (date of birth ████, 1978) and Azehira Ball (date of birth ██████, 1992). I have personally observed the Subject Premises, and it appears as described in Attachment A. Digital photographs of the Subject Premises were taken on September 8, 2016, and the photographs are consistent with the description as set forth in Attachment A.

42.    HSI-Jacksonville is investigating the use of one or more computers and computer media at the Subject Premises to commit violations of Title 18, United States Code, Sections 2252 and 2252A, which prohibit mailing, transportation, shipment, receipt, possession and access with intent to view, in interstate or foreign commerce by any means, including by computer, any child pornography.

43.    On September 9, 2016, I spoke with Detective Kevin Greene with the St. Johns County Sheriff's Office regarding this investigation and the facts establishing probable cause. Kevin Greene is a Detective for the St. Johns County Sheriff's Office with over fifteen (15) years of law enforcement experience. Detective

30

Greene is currently assigned to the Special Victims Section – Cyber Crimes Unit of the St. Johns County Sheriff's Office, specializing in sex crimes and child abuse investigations. Detective Greene began his Law Enforcement career in 2000 with the St. Johns County Sheriff's Office and has worked as a 911 Dispatcher, a Communications Training Officer, a Patrol Deputy, a Field Training Officer, a Property Crimes Detective, a Special Victims Section/Financial Crimes Detective, a Computer Forensic Examiner, and a Special Victims Section/Cyber Crimes Detective. Detective Greene is a member of the North Florida Internet Crimes Against Children (ICAC) Task Force, a Task Force Officer (TFO) assigned to assist the Violent Crimes/Child Exploitation Squad, Jacksonville Field Office, of the FBI and a member of the FBI Jacksonville Child Exploitation Task Force, which is comprised of federal, state and local law enforcement agents/officers conducting investigations involving persons who are, among other things, trafficking in and sharing child pornography via the Internet and soliciting children to produce sexually explicit images. Detective Greene has been a member of several other Federal Task Forces and has attended over 100 hours of specialized training in reference to computer, sex, and financial related crimes. Detective Greene has investigated or assisted in the investigation of matters involving the possession, collection, production, advertisement, receipt, and/or transmission of images of child pornography.

44.     On September 9, 2016, Detective Greene told me:

31

a.   On March 5, 2016, Detective Greene began an undercover operation to identify persons using the BitTorrent P2P network on the internet to receive, traffic in, share and/or distribute images of child pornography. Detective Greene was investigating host computers located in the North Florida area that were actively sharing child pornography on this Network. Through the use of specialized law enforcement software, he confirmed that a host computer using a particular IP address (98.224.40.87) (the "Subject IP Address") in Florida was hosting and offering for distribution ("sharing") a torrent file. The torrent file references 4,669 files, at least one of which was identified as depicting a minor engaged in sexually explicit conduct. During this investigation, the client P2P network reported its version as using BitTorrent client software -UT2210- µTorrent 2.2.1.

b.   Detective Greene conducted an internet search on the origin of the Subject IP Address and determined that the Subject IP Address was issued to Comcast Communications.

c.   On March 5, 2016, between the hours of 08:40 a.m. and 11:07 a.m., Detective Craven made a successful connection to the host computer at the Subject IP Address using an undercover computer through the Internet. Using this connection, he successfully downloaded 4,667 complete files directly from the host computer at the Subject IP Address. During the above-stated connection, the client P2P network version reported itself as using BitTorrent client software -UT2210- µTorrent 2.2.1.

32

d.     On March 7, 2016, Detective Greene caused a subpoena to be served to Comcast Communications, for the subscriber records of the account to which the Subject IP Address was assigned during the period from March 5, 2016 at 08:40:05 a.m. through 11:07:27 a.m. I reviewed the responsive documents received by Detective Green which disclosed the following information about the subscriber for the Subject IP address:

| | |
|---|---|
| Name: | Azeriha Ball |
| Service Address: | 2268 Mayport Rd Lot 128<br>Atlantic Beach, FL 32233 |
| Telephone number: | 904-418-0578 |
| Account Number: | 8495741223789946 |
| Account Status: | Active |
| IP Assignment: | Dynamically Assigned |

45.     I reviewed the files Detective Green downloaded from the Subject IP Address. Based on my training and experience, I believe most of the files depict at least one minor engaged in sexually explicit conduct, and therefore constitutes child pornography pursuant to Title 18, United States Code, Section 2256. Described below are three of the files that Detective Green downloaded from the Subject IP Address, which was being offered for sharing on the date and times listed below:

1)     DATE: March 5, 2016 at 8:40 a.m. through 11:07 a.m.

TITLE: 000073.jpg

**DESCRIPTION:**   This file is a color photo. The photo depicts a nude prepubescent female approximately two to four years old.  There is an adult male in the photo that is nude from the waist down. The male is penetrating the child's mouth with his penis.

2)   DATE:  March 5, 2016 at 8:40 a.m. through 11:07 a.m.

TITLE:  000247.jpg

**DESCRIPTION:**   This file is a color photo. The photo depicts a nude prepubescent female approximately 12 to 24 months old lying on her back with her legs opened to the camera. An adult male penis is in the photo between the child's legs. There appears to be male ejaculate covering the child's genitals and torso.

3)   DATE:  March 5, 2016 at 8:40 a.m. through 11:07 a.m.

TITLE:  000413.jpg

**DESCRIPTION:**   This file is a color photo. The photo depicts a nude prepubescent female approximately 12 to 24 months old lying on her back with her legs opened to the camera. Someone is penetrating the child's vagina with the nipple on a baby bottle.

46.    On September 9, 2016, I conducted a query of the Jacksonville Electric Authority which indicated that service is being provided to Cristobal Baldera at the Subject Premises and the service start date was July 15, 2013. On October 27, 2016, I conducted a second query and confirmed that Cristobal Baldera is still the identified Jacksonville Electric Authority customer receiving service at the Subject Premises.

34

47.     On April 11, 2016, I conducted a query of the State of Florida Driver's and Vehicle Identification Database (DAVID), which indicated that three active identifications were issued for the Subject Premises, the residence of 2268 Mayport Road, Lot 128, Atlantic Beach, FL 32233. Cristobal Baldera, with a date of birth of ███, 1978, Wilfredo C Baldera, with a date of birth of ███, 1978 and Azeriha Lynn Baldera, with a date of birth ███, 1992, all claim to reside at the Subject Premises. On October 28, 2016, I conducted another DAVID record checks and confirmed that both Wilfredo C Baldera and Azeriha Lynn Baldera still have the Subject Premises listed as their residence.

48.     On June 10, 2016, Special Agent Algozzini conducted surveillance of the Subject Premises and observed a 2002 Nissan sedan, with Florida License 2392PJ parked in the driveway at the Subject Premises. DAVID record checks reveal that this vehicle is registered to Wilfredo C Baldera. Also at the Subject Premises, parked under the covered driveway, was a 1998 Lexus sedan, with Florida License DHPN27. DAVID record checks reveal that this vehicle is registered to Wilfredo C Baldera. On October 27, 2016, I conducted surveillance of the Subject Premises and again observed the 1998 Lexus sedan, registered to Wilfredo C. Baldera, at the Subject Premises.

## CONCLUSION

49.     Based on the foregoing, I have probable cause to believe that one or more individuals has used and/or is using one or more computers and/or electronic storage media located at the Subject Premises at 2268 Mayport Road, Lot 128,

Atlantic Beach, FL 32233, more fully described in Attachment A to this affidavit, to, among other things, receive and possess child pornography. Therefore, I have probable cause to believe that one or more individuals, using the residence described above has violated 18 U.S.C. §§ 2252 and 2252A. Additionally, I have probable cause to believe that fruits, evidence, and instrumentalities of violations of 18 U.S.C. §§ 2252 and 2252A, including at least one computer and other electronic storage media containing images of child pornography, and the items more fully described in Attachment B to this affidavit (which is incorporated by reference herein), will be located in this residence. Accordingly, I respectfully request a search warrant be issued by this Court authorizing the search and seizure of the items listed in Attachment B.

Louis C. Hollis, Special Agent
Homeland Security Investigations

Subscribed and sworn to before me this 31st day of October, 2016, at Jacksonville, Florida.

MONTE C. RICHARDSON
United States Magistrate Judge

36

## ATTACHMENT A

## <u>PREMISES TO BE SEARCHED</u>

The premises to be searched is a residence located at 2268 Mayport Road, Lot 128, Atlantic Beach, FL 32233, that is a gray colored, double wide manufactured mobile home located in a mobile home community named "Admiral's Walk" which is located on the west side of Mayport Road. The exterior of the residence has gray colored siding with white skirting on the bottom. There is a covered driveway on the side of the residence that is supported by two posts. The back entrance is on the opposite side of the residence and has three wooden steps with a single handrail leading up to it. There is a concrete water fountain on the side of the house facing the road. The numerals "128" are located above and to the right of the covered driveway.

**ATTACHMENT B**

**LIST OF ITEMS TO BE SEIZED AND SEARCHED**

1.      Any and all computer(s), computer hardware, computer software, electronic storage media (including any and all disk drives, compact disks, flash drives, cellular telephones, personal digital assistants (PDA), digital cameras and/or memory cards, or any other device capable of electronic storage of data and/or images), computer-related documentation, computer passwords and data-security devices, videotapes, video recording devices, video recording players, and video display monitors that are or may be used to:  visually depict child pornography or child erotica; display or access information pertaining to a sexual interest in child pornography; display or access information pertaining to sexual activity with children; or distribute, possess, or receive child pornography or child erotica.

2.      Any and all computer software, including programs to run operating systems, applications, such as word processing, graphics, and communications programs peer to peer software, that may be or are used to: visually depict child pornography or child erotica, display or access information pertaining to a sexual interest in child pornography; display or access information pertaining to sexual activity with children; or distribute, possess or receive child pornography or child erotica.

3.      Any and all notes, documents, records, or correspondence, in any format and medium (including envelopes, letters, papers, email messages, chat logs

1

and electronic messages, and handwritten notes) pertaining to the possession, receipt, or distribution of child pornography as defined in 18 U.S.C. § 2256(8) or to the possession, receipt, or distribution of visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

4.      In any format and medium, all originals, computer files, copies, and negatives of child pornography as defined in 18 U.S.C. § 2256(8), visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2), or child erotica.

5.      Any and all diaries or address books containing names or lists of names and addresses of individuals who have been contacted by use of the computer(s) or by other means for the purpose of distributing or receiving child pornography as defined in 18 U.S.C. § 2256(8) or visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

6.      Any and all notes, documents, records, or correspondence, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and handwritten notes), identifying persons transmitting, through interstate or foreign commerce by any means (including the United States Mail or computer) any child pornography as defined in 18 U.S.C. § 2256(8) or any visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

7.      Any and all notes, documents, records, or correspondence, in any format or medium (including envelopes, letters, papers, email messages, chat logs and

electronic messages, other digital data files and web cache information) concerning the receipt, transmission, or possession of child pornography as defined in 18 U.S.C. § 2256(8) or visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

8.    Any and all notes, documents, records, or correspondence, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files) concerning communications between individuals about child pornography or the existence of sites on the Internet that contain child pornography or that cater to those with an interest in child pornography.

9.    Any and all notes, documents, records, or correspondence, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files) concerning membership in online groups, clubs, or services that provide or make accessible child pornography to members.

10.    Any and all records, documents, invoices and materials, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files) that concern any accounts with an internet service provider that may be or is used to: visually depict child pornography or child erotica, display or access information pertaining to a sexual interest in child pornography; display or access information pertaining to sexual activity with children; or distribute, possess or receive child pornography or child erotica.

3

11.     Any and all records, documents, invoices and materials, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files) that concern online storage or other remote computer storage, including software used to access such online storage or remote computer storage, user logs or archived data that show connection to such online storage or remote computer storage, and user logins and passwords for such online storage or remote computer storage that may be or are used to: visually depict child pornography or child erotica, display or access information pertaining to a sexual interest in child pornography; display or access information pertaining to sexual activity with children; or distribute, possess or receive child pornography or child erotica.

12.     Any and all cameras, film, videotapes or other photographic equipment that may be or are used to: visually depict child pornography or child erotica, display or access information pertaining to a sexual interest in child pornography; display or access information pertaining to sexual activity with children; or distribute, possess or receive child pornography or child erotica.

13.     Any and all address books, mailing lists, supplier lists, mailing address labels, and any and all documents and records, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files), pertaining to the preparation, purchase, and acquisition of names or lists of names to be used in connection with the purchase, sale, trade, or transmission, through interstate or foreign commerce by any means (including the

United States Mail or computer) any child pornography as defined in 18 U.S.C. § 2256(8) or any visual depiction of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

14.    Any and all documents, records, or correspondence, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files), pertaining to occupancy or ownership of the premises described above, including rental or lease agreements, mortgage documents, rental or lease payments, utility and telephone bills, mail envelopes, or addressed correspondence.

15.    Any and all diaries, notebooks, notes, and any other records reflecting personal contact and any other activities with minors visually depicted while engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).